February 22, 1993

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1181

ALBERT J. CADORETTE, ET AL.,

Plaintiffs, Appellees,

v.

UNITED STATES OF AMERICA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Walter Jay Skinner, U.S. District Judge]

Before

Breyer, Chief Judge,
Campbell, Senior Circuit Judge,
and Torruella, Circuit Judge.

Jacques B. Gelin, Attorney, Department of Justice, with whom
Barry M. Hartman, Acting Assistant Attorney General, A. John
Pappalardo, United States Attorney, George B. Henderson, II, Assistant
United States Attorney, and David C. Shilton, Attorney, Department of
Justice, were on brief for United States.
John D. Hallisey for appellee Jean Stevenson Clark.
Arthur C. Croce for appellees Roger Treat Jackson, Jr., Margery
Jackson Chambers, Barbara Jackson Allgeier, and Betsey Jackson
Patterson.

[NOTE FROM SYSTEMS: APPENDIX I is not available on the EDOS
publication of this opinion.]

BREYER, Chief Judge. In 1972 the United States

bought eight acres of land in Truro, Massachusetts, to add

to the Cape Cod National Seashore. Unfortunately, the

seller, Elizabeth Freeman, owned only a small percentage

share of the eight acres that she purported to convey.

Elizabeth's long-lived great-grandfather, Edmund Freeman,

(whom we shall call "Edmund the Elder") had owned 100% of

the eight acres when he died in 1870, but, after his death,

the property descended, through inheritance, to many

different children, grandchildren, and great-grandchildren,

each of whom obtained title to various small percentage

interests.

In 1984, plaintiff Jean Stevenson Clark brought

this action against the Government to "quiet title" to what

she said was her percentage share in the property -- a share

she claimed to have obtained from the grandchild of one of

Elizabeth's aunts. 28 U.S.C. 2409a(a) ("The United States

may be named as a party defendant in a civil action under

this section to adjudicate a disputed title to real property

in which the United States claims an interest"). Five years

later four grandchildren of a different aunt intervened in

the lawsuit in order to assert similar claims of ownership.

Eventually, the district court entered a judgment that tried

to sort out precisely who owned what, and set the

compensation that plaintiff and intervenors must receive

should the Government decide to keep their interests in the

property. 28 U.S.C. 2409a(b) ("if the final determination

[of the plaintiff's 'quiet title' action] shall be adverse

to the United States, the United States nevertheless may

retain such possession or control of the real property or of

any part thereof as it may elect, upon payment [of just

compensation] to the person . . . entitled thereto"). The

Government now appeals this judgment, arguing primarily that

the district court did not properly interpret or apply the

Massachusetts law of descent and distribution.

After the United States took this appeal, it filed

a complaint in condemnation, pursuant to 40 U.S.C. 257,

against the same property. United States v. 8.0 Acres of

Land, No. 92-12663S (D. Mass. filed Nov. 5, 1992). When

that condemnation is completed, the Government will take

whatever interests in the eight acres it does not already

own. Because the basic question in a "quiet title" action

is "who owns the land," and because condemnation

definitively answers this question for the future (i.e.,

"the United States does"), we have had to consider whether

-3- 3

(or the extent to which) the condemnation action has

"mooted" this "quiet title" proceeding.

We find that the district court correctly

allocated certain of the interests in dispute (those

inherited through ancestors named "Charles" and "Richard

Sr."), but that it improperly distributed certain other

interests (those derived from ancestors named "Betsey I" and

"Edmund II"). We also decide that the condemnation action

"moots" any further judicial efforts to allocate the "Betsey

I" and "Edmund II" shares in this "quiet title" proceeding.

Instead, the district court shall decide afresh who is

entitled to compensation for the "Betsey I" and "Edmund II"

shares in the context of the condemnation action now pending

before it.

I.

Background

With the help of a diagram (see Appendix I) and

the facts as revealed by the record on appeal, we shall

retrace the parties' contested claims and the district

court's determination of them. We begin with Elizabeth's

great-grandfather, Edmund "the Elder" Freeman, who was born

in 1780, and who died intestate in 1870. At Edmund the

-4- 4

Elder's death each of his three surviving children, and his

grandchildren by a fourth child, received an undivided 25%

interest in the eight acres. We shall refer to these four

siblings as (1) "Charles," (2) "Betsey I," (3) "Edmund II,"

and (4) "Richard Sr." The youngest of these siblings,

Richard Sr. (Elizabeth's grandfather), died in 1886. He

left his 25% interest to his five surviving children,

Richard Jr. (Elizabeth's father) and her four aunts. Each

of these five thereby obtained an undivided 5% interest in

the property. When Richard Jr. died in 1940, he left his 5%

interest to his daughters Elizabeth and Catherine, 2.5% to

each. Catherine (wife of the famous Admiral Nimetz)

subsequently conveyed to Elizabeth her vested 2.5% interest

(and, the court found, any inchoate interests as well).

Thus, Elizabeth, at the time she purported to convey the

eight acres to the United States in 1972, undoubtedly owned

at least a 5% share. But did she own any more, and if so,

how much?

The "quiet title" action sought to answer this

question. To do so, the court had to decide: (1) What

happened to the remaining 20% of Richard Sr.'s 25% share?

(2) What happened to the other 75% interest in the land

-5- 5

originally inherited by Richard Sr.'s three siblings --

Charles, Betsey I, and Edmund II -- 25% to each?

-6- 6

A.

Richard Sr.'s 25% Share

The district court had considerable genealogical

information about the line of Richard Sr. As we have said,

Richard Sr. was survived by five children, namely, Richard

Jr. (Elizabeth's father), and Elizabeth's four aunts, whom

we shall call, "Betsey II," "Ellen," "Clara," and "Ada." As

we have also said, Elizabeth obtained her father's 5%. The

district court found that the remaining 20% (initially

belonging to the aunts) descended and devised through

various routes, some parts eventually coming to Elizabeth,

other parts ending up in the hands of plaintiff Jean

Stevenson Clark (who took her interest from Clara's

grandchild, Phoebe), and still other parts ending up in the

hands of the intervenors, who are Ada's grandchildren.

No one contests this division (which is reflected

in Appendix II) in this appeal. It is therefore final, and

we need not discuss these interests further.

B.

Charles' 25% Share

We turn next to the 25% interest ascribed to

Charles. Charles died in 1868, two years before the death

-7- 7

of his father, Edmund the Elder, in 1870. Upon Edmund the

Elder's death, Charles' children inherited the 25% that

would have gone to Charles, had he outlived his father. See

Mass. Gen. L. ch. 190, 3(1) (When an intestate dies seized

of land, such land descends "[i]n equal shares to his

children and to the issue of any deceased child by right of

representation"). Charles' daughter Nancy inherited this

entire interest, as she was Charles' last surviving child,

and her siblings apparently died without issue. Nancy died

in 1931, without any surviving children. At that time

Richard Jr., who was Nancy's first cousin (and Elizabeth's

father), became the administrator of Nancy's estate. He

told the probate court that Nancy's next of kin were three

surviving first cousins, namely himself and two of his

sisters, Betsey II and Ada. He added that Nancy had several

living cousins in the next generation (i.e., in Elizabeth's

generation), namely, several of Edmund II's grandchildren.

The probate court subsequently distributed Nancy's estate

(including the 25% interest inherited through her father

Charles) equally to Nancy's living cousins in her own

generation, namely Richard Jr., Betsey II, and Ada. It thus

awarded each of them an additional 8.33% interest in the

property.

-8- 8

The district court in this case accepted the 1931

judgment of the Massachusetts probate court as

determinative, and factored this information into the chain

of conveyances and devolutions. (See Appendix II). The

United States, through Elizabeth, received her father's

8.33% interest plus some of both Betsey II's and Ada's

shares. The intervenors received the rest of Ada's 8.33%

interest, as well as some of Betsey II's share. Jean

Stevenson Clark received the tiny remainder of Betsey II's

share. The United States, though not arguing the matter at

any length, seems to contest this division.

C.

The 25% Share of Betsey I and the 25% Share of Edmund II

The district court had very little information

about what happened to the lines of Edmund the Elder's other

two children, Betsey I and Edmund II, each of whom inherited

a 25% interest in the eight acres. It knew that Edmund II

was born in 18ll and that he had seven children. The court

also knew that Betsey I died in 1895, that she had ten

children, and that she was survived at her death by two of

her children and eleven grandchildren. Finally, it had the

1931 probate court record of Nancy's estate, which suggests

-9- 9

that some of Edmund II's grandchildren (who were members of

Elizabeth's generation) were still alive in 1931.

The upshot is that the district court had evidence

of the existence of twelve or more grandchildren of Betsey I

and Edmund II, as of 1895 (eleven of Betsey I's

grandchildren) and 1931 (an undetermined number of Edmund

II's grandchildren). These individuals, like Elizabeth,

were great-grandchildren of Edmund the Elder. Their

descendants (if they exist) might be entitled to a 50% share

of the property. But, one of the intervenors told the

court, no one now knows anything about them.

Knowing no more than this, the district court

faced three main possibilities. First, Betsey I and Edmund

II might have descendants still alive. If so, then these

surviving descendants would own (subject to any further

transactions) their ancestors' 50% interest in the eight

acres.

Second, both lines may have died out, but only

after Elizabeth died in 1977. In that case, any descendants

of Edmund the Elder's two other heirs (namely, Charles and

Richard Sr.) still alive as of 1977 might have inherited

their interests (in the absence of such complicating

features as, say, wills). See Mass. Gen. L. ch. 190, 3(6)

-10- 10

(when an intestate dies seized of land and "leaves no issue,

and no father, mother, brother or sister, and no issue of

any deceased brother or sister, then [his estate descends]

to his next of kin in equal degree"). According to the

district court's uncontested findings, the only descendants

of Charles or Richard Sr. to survive Elizabeth were her

sister Catherine and her aunt Ada's grandchildren, Richard

Sr.'s great-grandchildren, namely, the intervenors. (Since

Catherine had conveyed her inchoate interests in the

property to Elizabeth back in 1941, she was not eligible to

inherit, even though she outlived Elizabeth by two years.)

On this hypothesis, therefore, Betsey I and Edmund II's 50%

share would have devolved to the intervenors.

Third, Betsey I and Edmund II's lines may have

died out before Elizabeth's death in 1977. In that case, to

determine who obtained their interests (even if we assume no

wills) is yet more complex, for it would depend upon just

when they died and which members of their generation

(descended from Edmund the Elder) were alive at that time.

Mass. Gen. L. ch. 190, 3(6) ("if there are two or more

collateral kindred in equal degree claiming [entitlement to

intestate next of kin's land] through different ancestors,

those claiming through the nearest ancestor shall be

-11- 11

preferred to those claiming through an ancestor more

remote").

The district court, choosing the second

possibility, concluded that the two lines died out after

Elizabeth's death in 1977. It then awarded the entire 50%

to the intervenors, dividing it equally among the four of

them. The Government's appeal focuses primarily upon this

determination, which, the Government contends, incorrectly

applies Massachusetts' law

of descent and distribution.

II.

The Legal Merits

As we have said, the United States contests the

way in which the district court allocated ownership of the

"Charles" line's 25% share, the "Betsey I" line's 25% share,

and the "Edmund II" line's 25% share. We do not understand

the basis for its claim of error in respect to the first of

these matters, a claim that it treats cursorily in its

brief. In 1931 a Massachusetts probate court decided that

this share belonged to Richard Sr.'s then-living children,

namely Richard Jr. (Elizabeth's father), Betsey II, and Ada.

It gave each of them one-third of the share. Ordinarily a

-12- 12

federal court will (indeed, must) accept such final state

court awards as legally binding. See 28 U.S.C. 1738

("judicial proceedings . . . of any court of any State . . .

shall have the same full faith and credit in every court

within the United States . . . as they have by law or usage

in the courts of such State"). Cf. U.S. Const. art. IV, 1

("Full Faith and Credit shall be given in each State to the

public Acts, Records, and judicial Proceedings of every

other State."). We are aware of no special reason here for

departing from this general rule. Consequently, we affirm

the district court's distribution of this 25% share.

We do not believe, however, that the district

court's awards of the other two 25% shares were legally

correct. To reach its conclusions the court had to find

(1) that all the descendants of Betsey I and Edmund II had

died out by 1984, but (2) that some such descendants were

alive as of Elizabeth's death in 1977. The court had before

it a record that reveals no significant effort by anyone to

search for, or to contact, by publication or otherwise, any

descendants of the Betsey I or Edmund II lines. (The court,

in fact, rejected the plaintiff's motion for the appointment

of a guardian ad litem to do precisely that.) Rather the

record contained only:

-13- 13

(1) the facts previously mentioned (namely, that
Edmund II had grandchildren alive in 1931 and that
Betsey I had eleven grandchildren alive in 1895);

(2) testimony by one of the intervenors, an
"amateur genealogist," that she had no knowledge
of any issue of either Betsey I or Edmund II;

(3) testimony by a genealogist for the Government
who had primarily investigated Richard Sr.'s line
that he had not found evidence of any living
descendants of Betsey I or Edmund II.

The district court reasoned from this evidence to its

conclusions in three steps, with the help of two

Massachusetts cases, Butrick v. Tilton, 155 Mass. 461, 29

N.E. 1088 (1892), and Loring v. Steineman, 42 Mass. 204

(1840).

First, Butrick involved plaintiffs who claimed

that they, rather than a tenant, had title to real property

that the tenant occupied. According to the district court,

Butrick held that, once the "demandants" prove "their

succession to the title," the burden then shifts to the

tenant to prove the "existence of other heirs whose title

would defeat or reduce the claims of the demandants." The

district court reasoned, by analogy, that once the

intervenors proved "their succession" to the Betsey I and

Edmund II interests, the burden then shifted to the United

States to show the "existence of other heirs," namely

descendants of those two lines.

-14- 14

Second, the district court stated that Loring held

(1) that the presumption of continued life persists for no

more than seven years after a person is last heard from, at

which point a "presumption of death" arises, and (2) that

those claiming that a person presumed dead left either

spouse or children have the burden of proving it. The

district court apparently reasoned that since no one had

heard of any descendant of Betsey I since at least 1895, nor

of any descendant of Edmund II since at least 1931, that

these descendants (alive in 1895 and 1931) were "presumed to

have died out." The court also concluded that United States

had not proved the existence of any issue.

Third, the district court noted that there "is no

indication in the file that any attempt to locate the heirs

of Betsey [I] or Edmund [II] was made until this action was

filed [in 1984]." For this reason, the court concluded that

the two lines would be presumed to have died out as of the

1984 filing date, seven years after Elizabeth's death in

1977.

We do not believe that these cases warrant the

result now before us. For one thing, Butrick involved

plaintiffs who established their "succession" to title with

at least a little more evidence than was present in this

-15- 15

case. The demandants there obtained title from their

ancestor, who had allegedly obtained title from relatives

(not the children) of a man named Jacob Ayer, who had died

in 1789. Jacob Ayer, in turn, inherited his interest from

his father. To establish their claim to at least some

ownership interest in the property, the plaintiffs had to

show that the relatives of Jacob Ayer had had title, which,

in turn, required them to show that Jacob Ayer had left no

issue. Butrick, 155 Mass. at 465. To establish the full

extent of Jacob Ayer's interest in the property, and hence

their own, the plaintiffs had to show that Jacob's brother

Joseph had died before Jacob died, and without issue. Id.

at 466.

To show the first of these matters, the plaintiffs

provided, as a witness, Mrs. Butrick, Jacob Ayer's step

great-granddaughter, whom the court held (given her

relationship and interests) competent to testify "as to

general repute . . . as to matters of pedigree." Id. Mrs.

Butrick testified that Jacob's second marriage (to her

great-grandmother) produced no issue and that she had never

heard of any issue from Jacob's first marriage. Id. at 465-

66. To show the second of these matters, the plaintiffs

submitted (1) the will of Jacob Ayer's father, which

-16- 16

mentioned six children, including Jacob, but not his brother

Joseph, and (2) "evidence of the unsuccessful inquiry where

it was probable that information could be found if Joseph

had been living up to 1810," including an examination of

headstones and official records in the town where he was

born. Id. at 466-67.

The evidence as to the first of these matters

(Jacob's lack of issue) seems at least a little stronger

than the comparable evidence here. One can more reasonably

be expected to know (as in Butrick) whether one's (step)

great-grandfather had children than to know (as here)

whether one has third cousins who are still living, i.e.,

whether one's great-grandfather had brothers or sisters who

had children who had children who had children who are now

alive. The evidence of the second of these matters (i.e.,

the extinction of a collateral line with a rival claim) is

much stronger in Butrick than here, for it included a

serious search, the failure of which had obvious probative

value. The record in this case, by contrast, contains no

evidence of any significant effort to locate, or to provide

notice to, the descendants of Betsey I or Edmund II. Of

course, the Massachusetts courts decided Butrick nearly a

century ago. But in light of the technological improvements

-17- 17

which have made it easier to track down other individuals,

we believe Massachusetts courts would insist, if anything,

on greater efforts to locate missing owners, rather than

needlessly tolerate lesser efforts.

We are also uncertain about whether, or just how,

Loring applies here, say, to Edmund II's grandchildren.

Loring involved a man who departed from where he lived, went

off to sea, and who was never heard of again by his family

and those in his native town. Loring, 42 Mass. at 206.

Edmund II's grandchildren do not seem quite like the missing

sailor, however, for there is no reason to believe that

those with whom they lived never "heard of" them after 1931.

See Knapp v. Graham, 320 Mass. 50, 54 (1946) (rival heir

will not be presumed dead where no proof of actual death or

unexplained absence from domicil or established residence

for more than seven years). The only reason we have not

heard of them again, as far as the record reveals, is that

no one has attempted to look for them.

Regardless, we do not see how Loring (whether or

not taken together with Butrick) could justify the district

court's conclusion that the two lines died out after 1977.

If we accept, for the sake of argument, that Loring's "seven

year" presumption applies, then we would have to presume

-18- 18

that Betsey I's grandchildren were no longer living seven

years after 1895, when, according to the record, their

existence was last documented. Similarly, we would have to

presume that Edmund II's grandchildren were no longer alive

seven years after 1931. Were that so (and assuming no

issue), the intervenors would not inherit the lost heirs'

entire interests, because others (including Richard Jr., the

father of Elizabeth, the Government's grantor) were alive in

1902 and/or 1938, and thus entitled to a share. The record

is totally silent as to whether Betsey I or Edmund II's

grandchildren produced issue. And, we do not understand

what rule of law would permit the court to presume both that

these grandchildren (and any issue they produced) still

existed in 1977 and that they died (without issue) shortly

after 1977.

For these reasons, we conclude that Massachusetts

law, as it applies to the facts before us, does not support

the district court's award of 50% of the locus (consisting

of Betsey I's 25% interest and Edmund II's 25% interest) to

the intervenors. We therefore must vacate the judgment

below insofar as it makes that award. We need not further

decide precisely how Massachusetts law ought to apply to the

-19- 19

existing record because, for reasons set out in Part III

below, the relevant facts may change.

-20- 20

III.

Further Proceedings

As noted above, the United States has filed, while

this appeal was pending before this court, a complaint in

condemnation against the eight acres at issue here. After

oral argument on appeal, the United States asked us to

vacate the judgment below so that the district court, in the

condemnation action, can determine compensable ownership

interests on a clean slate. We see no basis for vacating

the judgment below, however, insofar as that decision makes

a final award of interests. The judgment below is obviously

"final" with respect to Richard Sr.'s 25% share, for no one

has appealed from that award. See Restatement (Second) of

Judgments, 13 cmt. e ("A judgment may be final in a res

judicata sense as to a part of an action [or a claim]

although the litigation continues as to the rest"). It is

also "final" with respect to Charles' 25% share, for,

although the United States has appealed that award, we have

found no legal reason to disturb it. See id. at 13 cmt. f

("a judgment otherwise final remains so despite the taking

of an appeal . . . . finality [not being] affected by the

fact that the taking of the appeal [may] prevent[] its

execution or enforcement"). And, we do not believe the

-21- 21

United States should be able automatically to avoid a

district court's "quiet title" judgment with which it

disagrees simply by appealing it and filing a condemnation

petition in the interim. Here, it seems both fair and

potentially expeditious for the district court's "quiet

title" allocation of Charles's share to govern the

condemnation action's compensation decisions (as they will

in the case of Richard Sr.'s share). See id. at 27

(setting forth the basic principle of collateral estoppel).

Since we vacate the judgment below in respect to

the rest of the "quiet title" action, which concerns the

distribution of the Betsey I and Edmund II shares, there is

no final judgment in effect regarding those shares. And

because we find that condemnation will eliminate the

requisite controversy as to who owns the Betsey I and Edmund

II shares, we order the district court to dismiss the

complaint in respect to the vacated portions as "moot." The

district court should determine afresh whom to compensate

for those shares in the context of the separate condemnation

action. Because we have found authority from a sister

circuit that casts doubt upon our finding of partial

mootness, and because the plaintiff and intervenors oppose

vacatur, we shall explain our reasoning in some detail.

-22- 22

At the outset, one must understand a few of the

technical differences between a "quiet title" action and a

"condemnation" proceeding. A condemnation action is brought

by the Government and proceeds in rem against the property

itself. See United States v. Carmack, 329 U.S. 230, 235 n.2

(1946). As an exercise of eminent domain, condemnation

"extinguishes all previous rights," Duckett & Co. v. United

States, 266 U.S. 149, 151 (1924), and gives the United

States title to the entire condemned property "good against

the world." Norman Lumber Co. v. United States, 223 F.2d

868, 870 (4th Cir.), cert. denied, 350 U.S. 902 (1955).

Condemnation secures better title, in fact, than may be

obtained through voluntary conveyance. See Carmack, 329

U.S. at 239. The title to the property vests in the United

States when the award of "just compensation" has been

ascertained and paid. See Albert Hanson Lumber Co. v.

United States, 261 U.S. 581, 587 (1923); United States v.

341.45 Acres of Land, 751 F.2d 924, 926 n.2 (8th Cir. 1984)

(where Government files a complaint in condemnation, title

passes when compensation award paid into district court).

Upon receipt of the award, the district court will

distribute it among those who owned the property at the time

of condemnation. See Fed. R. Civ. P. 71A(j).

-23- 23

In an action under the Quiet Title Act, by

contrast, a private plaintiff names the United States "as a

party defendant . . . to adjudicate a disputed title to real

property in which the United States claims an interest . . .

." 28 U.S.C. 2409a(a). If the plaintiff prevails, he can

recover the land wrongly held by the United States. The

Quiet Title Act also permits the Government to retain

property it does not own, but only after a court has reached

a "final determination" in the title dispute "adverse to the

United States." Id. at 2409a(b). At that point, the

United States can elect to keep the prevailing plaintiff's

interest in the land by paying him "just compensation" for

it. Id. Yet even if the United States acquires the

plaintiff's interest, it will nonetheless be potentially

liable to third parties not joined in the action, who may

have better title than either the plaintiff or the

Government. See, e.g., Younce v. United States, 661 F. Supp

482, 487-88 (W.D.N.C. 1987) (judgment for Government in

2409a lawsuit means that United States holds title superior

to plaintiffs, but not necessarily good title as against the

world), aff'd, 856 F.2d 188 (4th Cir. 1988); Oneida Indian

Nation v. New York, 732 F.2d 261, 265 (2nd. Cir. 1984)

("Ordinarily a judgment in a[] . . . quiet title action will

-24- 24

not affect the interests of others than the parties or those

in privity with them."). This is because a "quiet title"

action is, generally speaking, an in personam proceeding,

see Nevada v. United States, 463 U.S. 110, 143-44 (1983),

the purpose of which is to determine which named party has

superior claim to a certain piece of property. See 74 C.J.S.

Quieting Title 1, at 11 (1951). But see id. 7, at 18 &

Supp. 1992 (scattered authority for proposition that "quiet

title" action can operate in rem or quasi in rem).

Keeping these descriptions of the two actions in

mind, one can understand our conclusion that the

condemnation proceeding has "mooted" what remains of the

"quiet title" controversy (i.e., that portion of the "quiet

title" controversy for which no final judgment is in

effect). The Quiet Title Act authorizes only actions that

require courts "to adjudicate a disputed title to real

property in which the United States claims an interest . .

. ." 28 U.S.C. 2409a(a) (emphasis added). The words of

the statute, taken literally, permit adjudications only when

the title or ownership of real property is in doubt. Cf.

Ginsberg v. United States, 707 F.2d 91, 93 (4th Cir. 1983)

(landlord cannot maintain 2409a "quiet title" action

against United States in dispute over Government's alleged

-25- 25

breach of contractual obligations as tenant under lease,

since dispute does not cast doubt on the title or ownership

of the property). The initial inquiry in any such action

must therefore be, "Who holds superior title to the property

-- the plaintiff or the United States?" Only if the courts

finally resolve the title dispute in a manner "adverse to

the United States" (i.e., the plaintiff holds superior

title) will they reach a second question, "Does the United

States wish to keep the plaintiff's property interest,

regardless, by paying just compensation for it?" Once the

property has been condemned, however, the "quiet title"

court cannot make a "final determination" as to title that

is "adverse to the United States." The condemnation gives

the United States indefeasible title. Hence, the "quiet

title" action's first question -- "Who has superior title?"

-- is preclusively determined in the United States' favor.

The upshot is that the filing of the condemnation

action has eliminated the prerequisite for a "quiet title"

action -- a "disputed title" -- and thereby "mooted" its

threshold inquiry, "Who owns title?" For this reason, the

unresolved portion of this "quiet title" action cannot

continue.

-26- 26

Strong practical considerations support our

technical reading. A condemnation action seems to provide a

more effective way than a "quiet title" action to deliver

just compensation to those private persons entitled to

receive it. "Quiet title" procedures do not automatically

provide for the notification of persons not party to the

action (e.g., the "lost" descendants of Betsey I and Edmund

II) who may have title superior to both plaintiffs and the

Government. Thus, the true owners may not receive

compensation, and a court, wrongly believing that they do

not exist, may order the Government to pay the plaintiffs

full compensation, thereby exposing the Government to double

liability should the true owners eventually surface and sue.

The procedures for condemnation, by contrast,

expressly require the Government to take steps to search for

"lost" heirs. See Fed. R. Civ. P. 71A(c)(2) ("prior to any

hearing involving the compensation to be paid for a piece of

[condemned] property, the [condemnor] shall add as

defendants all persons having . . . an interest in the

property whose names can be ascertained by a reasonably

diligent search of the records, . . . and also those whose

names have otherwise been learned."). As a result, these

-27- 27

procedures tend to compensate those entitled to compensation

and to protect the Government from double liability. They

also make it less likely that the Government will obtain a

windfall, for example, by physically occupying land it does

not own, and whose unknown owners never bring a "quiet

title" action to obtain payment; the Government must pay the

entire value of the condemned property into court, whether

or not it has ascertained who owns it. See United States v.

3276.21 Acres of Land, 194 F. Supp. 297, 300 (S.D. Cal.

1961) ("Any contest between persons claiming an interest in

the award is heard . . . only after the award for all the

interests in the land has been made"). And, the court

apparently retains a degree of freedom to divide this

compensation (and to condition its distribution) in a manner

that seems fair, in light of the possibility that "lost"

heirs may eventually appear. See, e.g., United States v.

550.6 Acres of Land, etc, 68 F. Supp. 151, 154 (D. Ga.)

("where neither claimant shows right or title to [the

condemnation award], the money should remain subject to the

control of the court for disbursement to the proper

claimant, when and if he should appear"), aff'd sub nom.

Shropshire v Hicks, 157 F.2d 767 (5th Cir. 1946). Indeed,

courts have held that, where a "true owner" appears after

-28- 28

the condemnation award has been distributed, this "true

owner" may obtain a proper share from those persons who

wrongly received such award. See In re Block bounded by

Chauncey St., etc., 209 N.Y. 127, 102 N.E. 638, 640 (1913)

(uncompensated true owner of condemned land can bring an

action for money had and received against person to whom

condemnation award erroneously paid); Palo v. Rogers, 116

Conn. 601, 165 A. 803, 805 (1933) (where city erroneously

paid landowner rather than mortgagees for land taken,

mortgagees had good cause of action to recover such amount

from landowner).

These practical considerations seem particularly

important in this case, since the more thorough

investigation that the condemnation action promises will

likely permit an easier resolution of the issues of

Massachusetts law.

We have found, however, authority from the Fourth

Circuit, Fulcher v. United States, 632 F.2d 278 (4th Cir.

1980) (en banc), followed by the Eighth Circuit, United

States v. Herring, 750 F.2d 669, 672 (8th Cir. 1984), that

casts doubt upon our "mootness" conclusion. In Fulcher, a

plaintiff brought a 2409a action in 1977 to "quiet title"

to property which the Government had condemned eighteen

-29- 29

years earlier, in 1959, without properly notifying him. A

majority of the Fourth Circuit, sitting en banc, held that

the 1959 condemnation vested indefeasible title in the

Government. Fulcher, 632 F.2d at 284 (plurality); id. at

294 (Hall, concurring in part and dissenting in party); id.

at 295 (Murnaghan, dissenting). Yet a majority also held

that the plaintiff could nonetheless maintain a 2409a

"quiet title" action in order to obtain just compensation

for the Government's appropriation of his property. Id. at

285 (plurality); id. at 286 (Phillips, concurring). The

Circuit reached this result even though the plaintiff could

have sought compensation in the Court of Claims (now known

as the United States Claims Court) by bringing a takings

claim under the Tucker Act. 28 U.S.C. 1491 ("The United

States Claims Courts shall have jurisdiction to render

judgment upon any claim against the United States founded .

. . upon the Constitution"). See Fulcher, 632 F.2d at 295

(Murnaghan dissenting) (arguing that Court of Claims was the

appropriate forum for plaintiff's claim). Fulcher's

holding, applied to the present case, suggests that the

Government's condemnation of the eight acres at issue here

does not "moot" the intervenors' remaining "quiet title"

claims, or prevent the parties from adjudicating

-30- 30

compensation in the context of the "quiet title" action.

One might well ask, if Fulcher's plaintiff could bring a

post-condemnation "quiet title" action seeking only

compensation, how can we say that the condemnation action

"moots" further (compensation-seeking) proceedings in the

"quiet title" action before us?

We could answer that question by pointing to

differences between this case and Fulcher. The Fulcher

plurality, for example, focused primarily on whether a

plaintiff could sue for compensation in a highly convenient,

local "quiet title" forum, or would, instead, have to sue

for compensation (under the Tucker Act) in the less

convenient Court of Claims. Fulcher, 632 F.2d at 282, 285-

86 (plurality). Here, by contrast, the plaintiffs can

obtain compensation in the local district court even without

the Quiet Title Act, and other practical considerations

argue strongly in favor of ending the "quiet title" action

and proceeding henceforth in condemnation.

The Fulcher plurality also developed a theory that

the plaintiff (not properly notified in the earlier

condemnation action) had a kind of "equitable lien"

enforceable in a later "quiet title" action. Id. at 284-85

(plurality). That theory is not applicable here, as the

-31- 31

named plaintiffs have all been notified about the

condemnation complaint.

Rather than distinguish Fulcher on grounds that

may further complicate this complex area of law, however, we

believe it more straightforward to say that we disagree with

its reasoning. At bottom, the Fulcher plurality interpreted

the "quiet title" statute as allowing the post-condemnation

suit because (1) of policy grounds favoring adjudicating

property-related disputes in nearby courts, and (2) its

inability to find strong reasons against such an

interpretation. Indeed, it wrote that it "perceive[d]

neither congressional intent nor principled reason for

distinguishing" between "takings" effected without formal

condemnation proceedings (which, if made without proper

compensation, can give rise to "quiet title" actions by the

uncompensated owners for payment) and "takings" arising out

of formal condemnation proceedings (which, if made without

proper compensation, can give rise to Court of Claims

proceedings for payment). Id. at 284 (plurality).

We do see a crucial distinction, however, between

bringing a "quiet title" action where title is still in

dispute and bringing a "quiet title" action after the

Government has indisputably obtained title through

-32- 32

condemnation. This distinction, as we have said, lies in

the theory of the "quiet title" suit as an action to

adjudicate disputed title, and in the language of the

federal "quiet title" statute itself. That statute

provides that the Government may retain real property (by

paying just compensation) only "if the final determination

[of the underlying 'quiet title' action] shall be adverse to

the United States . . . ." 28 U.S.C. 2409a(b) (emphasis

added). Where the United States has indisputably obtained

title, it is difficult to see how this condition could be

fulfilled. So even though, as the Fulcher plurality stated,

the legislative history of the Quiet Title Act "is

inconclusive about claims of omitted owners arising out of

formal condemnation proceedings," Fulcher, 632 F.2d at 284

(plurality), the language of the statute, and its underlying

logic, are not.

A second consideration that threatens our

conclusion of "mootness" lies in the fact that the

Government has not yet paid an amount deemed to be "just

compensation" into court. As the case law makes clear,

title shifts upon payment of this amount, not before. See

Albert Hanson Lumber Co., 261 U.S. at 587; 341.45 Acres of

Land, 751 F.2d at 926 n.2. The Government has told us,

-33- 33

however, that it intends to proceed with the condemnation

action. We surmise that it has held up actual payment

pending our decision in this appeal. We shall therefore

eliminate this "chicken and egg" problem by conditioning our

judgment, insofar as it orders the remanded "quiet title"

action to be dismissed, upon the Government's payment of the

condemnation award into the district court.

IV.

The Judgment

1. The 25% share of Richard Sr. As we previously

pointed out, no one has appealed the district court's

judgment allocating the 25% undivided interest that

originally belonged to Elizabeth's grandfather, Richard Sr.

We therefore affirm the judgment below in respect to that

share, and direct the district court to order the Government

to compensate the parties according to its original

determination.

2. The 25% Share of Charles. We also affirm the

district court's distribution of the 25% share originally

inherited through Charles. This distribution, as we have

said, simply implemented the Massachusetts probate court's

-34- 34

1931 decision allocating this share, a decision whose

validity has not been challenged.

3. The 25% Shares of Betsey I and Edmund II,

Respectively. For the reasons stated above, we vacate the

district court's distribution of the 50% interest initially

belonging to Betsey I and Edmund II, and order the district

court to dismiss what remains of the original "quiet title"

action as "moot" when the Government pays the award into

court in the condemnation proceeding. The parties must

relitigate their claims to entitlement to compensation for

these shares in the condemnation proceeding, in light of any

new evidence revealed therein.

So Ordered.

-35- 35

APPENDIX I is not available on the EDOS publication of

opinion 92-1181.

-36- 36

APPENDIX II

The district court awarded the Richard Sr. and Charles shares, comprising one

one-half of the title to the property, as follows:

The United States 27.24%

Jean Stevenson Clark 3.17%

The Intervenors:

Barbara Jackson 12.39%

The three children of

Roger Jackson

(Roger Jr., Margery, &

Betsey III) 7.23%

-37- 37